# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JESS CHARLES, KRYSTYNA CHUDA, GERARD FEIDNER, ROSLYN HUEBENER, MILL JONAKAIT, CARMEN KOLODICH, RICHARD KOLODICH, MARY MCGUCKIN, DEBORAH PERRIN, JOHN DAVID TINEO, KRYSTYNA ZABLOCKI, and TADEUSZE ZABLOCKI,<br><br>Plaintiffs,<br><br>vs.<br><br>THE CITY OF NEW YORK, THE HORTICULTURE SOCIETY OF NEW YORK, NORTH BROOKLYN PARKS ALLIANCE, NORTH BROOKLYN OPEN STREETS COMMUNITY COALITION, NORTH BROOKLYN MUTUAL AID, FORT GREENE OPEN STREET COALITION, LOISAIDA OPEN STREET COMMUNITY COALITION, W103 OPEN STREET COMMUNITY COALITION, 34TH AVENUE OPEN STREETS COALITION, NOEL HIDALGO, CLARA SMITH, KEVIN LACHERRA, JEFFREY HODSDON, NUALA O'DOHERTY-NARANJO, JIM BURKE and JOHN & JANE DOES 1-99,<br><br>Defendants. | Case No. ___-cv-___ (xxx)(xxx)<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs JESS CHARLES, KRYSTYNA CHUDA, GERARD FEIDNER, ROSLYN HUEBENER, MILL JONAKAIT, CARMEN KOLODICH, RICHARD KOLODICH, MARY MCGUCKIN, DEBORAH PERRIN, JOHN DAVID TINEO, KRYSTYNA ZABLOCKI, and TADEUSZE ZABLOCKI ("Plaintiffs"), by and through their attorneys Valli Kane & Vagnini LLP, hereby bring this Complaint against THE CITY OF NEW YORK, THE HORTICULTURE SOCIETY, NORTH BROOKLYN PARKS ALLIANCE, NORTH BROOKLYN OPEN STREETS COMMUNITY COALITION, NORTH BROOKLYN MUTUAL AID, FORT

GREENE OPEN STREET COALITION, LOISAIDA OPEN STREET COMMUNITY COALITION, W103 OPEN STREET COMMUNITY COALITION, 34TH AVENUE OPEN STREETS COALITION, NOEL HIDALGO, CLARA SMITH, KEVIN LACHERRA, JEFFREY HODSDON, NUALA O'DOHERTY-NARANJO, JIM BURKE and JOHN & JANE DOES 1-99 ("Defendants"), and hereby allege as follows:

## INTRODUCTION



"All animals are equal, but some animals are more equal than others."

— George Orwell, Animal Farm

1.     Only the City of New York (the "City) could come up with a program that promises to eventually choke off 100 miles of public roadways (representing 1.6% of the City's total street mileage) and 20 miles of public bus lanes, and which robs *tens of thousands* of disabled City residents of their independence by turning them into shut-ins, and assign it such an Orwellian "Newspeak" name as it has done here: the "Open Streets Program."

2.     This civil rights case, brought by disabled City residents, challenges that program as a form of unlawful creeping kudzu that discriminates against disabled residents of the City by barring them from the City's public street services and restricting their access to vehicular traffic in violation of Title II of the Americans with Disabilities Act (the "ADA"), the Rehabilitation Act, 42 U.S.C. §1983, the New York State Human Rights Law, and the New York City Human Rights Law.

3. Under the "Open Streets Program," the City actually *closes* avenues and streets to vehicular traffic by placing metal police barricades, stanchions, oversized slabs of concrete, gigantic concrete planters, pedestrian plazas and other types of impediments, to specifically bar individuals who access and navigate New York City's roadways by automobile.

4. The City's labeling of its actual closure of public streets as an "Open Streets Program" has obfuscated the fact that throughout the City blocks of streets, connections of those streets, and the public accommodations on those streets are completely closed to vehicular traffic and are actually closed on a *continuous*, *daily basis*, to individuals with disabilities whose only means of accessing any of these public services is by motor vehicle. The City's system of street closures cumulatively impedes hundreds of thousands of individuals protected by federal, state, and municipal law.

5. The City's Open Streets Program should have been designated correctly for what it is, and will at times be referred to herein as, the City's "Closed Streets Program." Plaintiffs' challenge to the City's ~~Open~~ Closed Streets Program is grounded in the prohibition against discrimination against individuals with disabilities in all areas of public life. Yet the City's mandarins in its Department of Transportation, and its third-party confederate co-defendants, have rammed this program down the throats of the disabled to appease a population of affluent "biker bros." The cyclists are affiliated with the billionaire-funded "Transportation Alternatives," a jackbooted lobbyist group of climate change zealots who "demand that cars be barred" from Manhattan altogether (*see* www.transalt.org/ourstory) and whose "brown shirts" viciously harass anyone who interferes with their self-proclaimed right to exclusive dominion over the City's public streets and sidewalks (*see, e.g., https://twitter.com/i/status/1637522929234718721*) (video of

cyclist screaming at an Access-A-Ride paratransit driver pulled over at a curb to transport the disabled).[1]

6.      The program was enacted by the New York City Council, and defendant the City of New York (through its Department of Transportation) began implementing the program on an increasing, rolling basis, in April 2020. The program results in the *de facto* closure of New York City's public avenues and streets to individuals with disabilities -- whose only or primary access to the streets and to the buildings, businesses and services on the streets -- is through the use of motor vehicles.

7.      The program's implementation completely disregards the fact that individuals with mobility disabilities rely on motor vehicles, whether their own, that of a caregiver, or through a ride share or para-transit service, to take them to and from their residences, places of employment, recreational activities, doctors' offices, shops, and to pursue their activities of independent daily living.

8.      Generally speaking, individuals with disabilities are protected by federal mandates included in the ADA and Rehabilitation Act that require the provision of *equal access* to places of public services and public accommodations, whether or not their impairments are visible to the public's eye. Under the ADA, persons with disabilities include persons who have, or may have

---

[1] While the group pays lip service to progressive ideals of equity and inclusion, claiming that this "redistributing" of space will "help address decades of inequitable policies that have disproportionately impacted low income community of color across New York City" (*see https://www.transalt.org/open-streets-progress-report/#summary-findings*), in reality the program effectively privatizes public streets in service of mostly white, mostly high income workers who live within walking and bicycle distance from their jobs, at the expense of mostly non-white, mostly lower wage workers who cannot afford to live in close proximity to high paying jobs in like midtown and downtown Manhattan and Brooklyn (*see, e.g.*, https://www.dcpolicycenter.org/publications/the-demographics-of-walking-and-biking-to-work/) (explaining that policies that promote walking, biking and living near public transit amplify transportation injustices and gentrification, disparately impacting black and brown communities). While this case concerns only the right of the *disabled* to access public services, one can certainly imagine alternative legal challenges to the program asserted by plaintiffs alleging disparate impact race discrimination.

had, or may be regarded to have a physical or mental impairment that substantially limits one or more major life activities.

9.     *Approximately 11% of New York City's population has a disability.  Over 500,000 New Yorkers have a disability that affects their mobility* (*i.e.*, an ambulatory disability, which is generally classified as an impairment that prevents or impedes an individual's ability to walk).

10.     Ambulatory disabilities are particularly common among New York City residents who are seniors, veterans, individuals living with Alzheimer's disease, cerebral palsy, muscular dystrophy, spinal cord injuries, orthopedic impairments, or the long-term effects of brain injuries, for example, as well as visitors to New York City living with similar impairments.

11.     For individuals with disabilities that impact mobility and other major life activities, unimpeded access to streets by motor vehicles, unimpeded curb-cut access to sidewalks, and unimpeded access to sidewalks themselves, are *imperative* to moving around New York City on an equal basis with citizens that have no disabilities.  For instance, individuals who use wheelchairs, as well individuals with visual impairments, rely on curb cuts to safely cross a street and mount a sidewalk. However, by placing "open" street barricades that prevent motor-vehicle access to city streets, and that frequently block curb cuts, Defendants have effectively littered New York City with impediments that bar the disabled from accessing the public streets equally, discriminating against those individuals cavalierly and with impunity, in spite of the ADA's prohibition against such discriminatory practices and behavior.

12.     The City's operation of its Closed Streets Program includes its unlawful delegation of the City's police power authority to a network of Transportation Alternatives "activists," community organizations and their "volunteers" to police the closure of the selected "Open"

streets, and to restrict access by vehicular traffic to those streets so that, at most times during a 24-hour period, the closed streets are only accessible to pedestrians and cyclists.

13.     The City flaunts its Open Streets Program as one that "transforms streets into open public spaces" – into blocks of pedestrian plazas – but completely refuses to acknowledge the injurious impact that the program's barriers, barricades and other impediments have on individuals living with ambulatory disabilities.  The City champions Open Streets as featuring "activities that promote economic development, support schools, and provide the public with opportunities to enjoy cultural and community programs," without acknowledging that individuals with ambulatory disabilities are specifically excluded from accessing or enjoying those features, on a daily basis, on each street that is actually closed, or connected by a street that is actually closed, under the City's Open Streets Program.

14.     The City's Closed Streets Program also flouts federal mandates under the ADA and Rehabilitation Act for accessibility to all public services for individuals with disabilities (*i.e.*, that public routes remain continuous, unobstructed paths to connect all accessible elements and spaces in New York City's streets and public accommodations), not only by the City's placement of impediments to bar access to vehicular traffic, but also by permitting citizen "volunteer" patrols to block or restrict access on and off streets selected for permanent closure to vehicular traffic.

15.     As a result of the City's Closed Streets Program, tens of thousands of individuals with disabilities struggle to work, shop, worship, go to doctors, socialize, engage in other activities of daily life and access life-saving emergency services on an equal basis with people who do not live with one or more disabilities.

16.     New York City residents like the Plaintiffs here have become forced shut-ins because of Defendants' use of these entirely unnecessary disability barriers, and this focused form

of policing.  In addition, many of New York City's senior citizens -- like plaintiff Richard Kolodich, who was denied equal access to medical services because emergency vehicles and personnel were barred for what was a significant period in their attempt to treat him timely and get him to a hospital while he was experiencing a heart attack -- are at particular risk of loss of life, because of the City's Closed Streets Program.  With the Closed Streets Program, the City has in fact closed public streets to individuals living with all sorts or varying types of ambulatory disabilities.

17.    The City's Closed Streets Program impairs equal access.  The City's Closed Streets Program effectively isolates (*i.e.* segregates) a large percentage of New York City population from the streets that the City seeks to continue to transform to pedestrian-only-access roadways, by limiting or barring, most significantly, persons living with mobility disabilities from accessing a large number of New York City's public streets on a daily basis.  In doing so, the City has created public spaces – at and on each of the "Open Streets" at any given time, or on any given day, or for any given period -- that are neither equally accessible to nor equally available for use by individuals with mobility disabilities.

18.    The barriers, barricades and other impediments used by the City to operate its Closed Streets Program -- whether they are the large concrete planters with blossoms of flowers or fauna, or large military-styled concrete barriers bolstered by do-not-cross notices signs and police barricades depicted in this complaint or as part of the City's program – are *prima facie* evidence of disability discrimination.  Under the City's Closed Streets Program, Plaintiffs (and other New York City residents with disabilities like the Plaintiffs) have been injured, because of the City's limitation or bar of their access to scores of public streets by motor vehicles, or the City's limitation or bar of vehicular traffic on the streets that are now closed, at all times that those

streets are open and fully accessible to individuals who do not live with mobility disabilities. The fact is that City's Closed Streets Program is an inherently discriminatory program.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over the claims under Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12132 *et seq*. (the "ADA"), §504 of the Rehabilitation Act, 29 U.S.C. § 794(a)(2), and under 42. U.S.C. § 1983, pursuant to 28 U.S.C. § 1343(a)(4), which confers original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief or other relief under any Act of Congress providing for protection of civil rights, and pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court in a civil action arising under the Constitution or laws of the United States.

20.     The Court's supplemental jurisdiction is invoked pursuant to 28 U.S.C. § 1367 (a), which confers supplemental jurisdiction over all non-federal claims arising from a common nucleus of operative facts such that they form part of the same case or controversy under Article III of the United States Constitution.

21.     Venue is proper in this Court pursuant to the ADA, the Rehabilitation Act, and § 1983, because Plaintiffs reside in this judicial district, this judicial district lies in a State in which the unlawful practices occurred, and the records relevant to those unlawful practices are maintained and administered in this district.

## STATEMENT OF FACTS

22.     The Closed Streets Program (the "Program") was enacted by the New York City Council in April 2020 (and amended by Bill # Int. 1933-2020)[2] as a temporary emergency measure during the Covid-19 pandemic to provide spaces for the public to gather safely outdoors.

23.     The Program was made permanent in 2021 by New York City Council. The New York City Department of Transportation ("DOT") is the designated City agency to implement, manage and facilitate the Program.

24.     The term "open street" is defined as "a street or segment of a street designated by the DOT as such, on which motor vehicle access is controlled by barriers and signage or other traffic calming measures, and on which priority is given to pedestrians, individuals using bicycles, and other non-vehicular street users."[3]

25.     There are 135 ~~Open~~ Closed Streets across all five boroughs of New York City.  The DOT designates new ~~Open~~ Closed Streets using a rolling application process, wherein volunteers, activists and community organizers seek to designate streets for the Program, and to be provided by the City with the police power to enforce the Program.  DOT plans to continue to close more streets as the Program continues.

26.     Prior to the implementation of the Program, the DOT failed to do an environmental impact study or traffic study.  There has been no assessment of the conditions potentially created (or the impact upon the disabled) from closing even one street, let alone the hundreds of city blocks included the Program.

---

[2] https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4424528&GUID=796B94D6-9FD4-4448-8E8A-9A631444F421&Options=&Search

[3] New York City Admin. Code §19-107.1(a).

27.     For over the last three years, the Program has closed streets based on arbitrary and indiscriminate applications, yet there have been no post closure studies nor analysis of the negative consequences that have resulted from the closures.

28.     The Program bans or restricts traffic by obstructing streets with heavy concrete barriers, heavy planters, and with interlocking metal police stanchions that are normally used by law enforcement for crowd control. The two models of police stanchions used by Defendants are six or four feet and seven inches long, and are forty three inches high, and these are the heaviest and most difficult types of stanchions to move because they have flat or bridge "feet" (*see* hyperlink: [Barricade FAQ)](). These feet are low to the ground and are a tripping hazard for people with vision disabilities. Further, the barriers are far too heavy for people whose disabilities affect their strength, endurance, and mobility. Ultimately, these police stanchions are designed to be set down and left alone in order to restrict and funnel the movements of crowds. As a result of these stanchions and the other types of physical barriers (e.g., concrete planters), the Program has led to the *de facto* closure, to automobiles, of public streets throughout the City of New York.

29.     The Program is managed by the DOT, which delegates police power to a network of city employees, Open Streets activists, community organizations and their volunteer members.

30.     The Program significantly and detrimentally harms the disabled by severely limiting their entry and egress to and from their residences and businesses they patronize, hampering their ability to access ride-sharing transportation (such as Uber and Lyft) and Paratransit services (such as Access-A-Ride), impeding access to emergency services (whose vehicles often cannot navigate around concrete barriers and other "traffic calming" measures), restricting their ability to go to and from their doctor's appointments.

31.     The Program, as implemented, runs afoul of, *inter alia*, the ADA and the Rehabilitation Act by unlawfully restricting the ability of disabled individuals to enter and exit the streets where they reside or need to reach businesses and other places necessary for their independent daily living.

32.     Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §12132.

33.     The Rehabilitation Act similarly provides that "No otherwise qualified individual with handicaps in the United States … shall, solely by reason of his or her handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." § 29 U.S.C. § 794(a).

34.     As set forth below in the Parties section of the Complaint, below, Plaintiffs are each "qualified individuals" within the meaning of the ADA and the Rehabilitation Act.

35.     Defendants are subject to the ADA because the City of New York provides local government services, including the provision of public streets and sidewalks.

36.     Defendants are subject to the Rehabilitation Act because upon information and belief the City of New York receives federal funds. For example, upon information and belief, the City of New York received federal funds that it used for the implementation of the Closed Streets Program through federal funding for the City's "Vision Zero" initiative

37.     Plaintiffs have been denied the opportunity to participate in or benefit from the City of New York's services, programs, or activities related to the provision of public streets and

sidewalks or have otherwise been discriminated against by defendants by reason of Plaintiffs' disabilities.

38.     The Program, as enacted, is supposed to limit access to the designated Open Streets areas through the use of barricades and other putative "traffic calming" measures. The signage on the barricades indicates that while the streets are closed to automobiles generally, local vehicles are permitted to access the streets in order to, for example, park their automobiles by moving the barricades. Of course, this requires a driver to stop and secure their vehicle, exit the vehicle, move the barricade, drive through the barricade, stop and secure their vehicle again, exit the vehicle, replace the barricade, return to their vehicle, and continue driving.

39.     However, in practice, Defendants often effectuate the Program by blocking off the designated street areas (including streets, sidewalks, and crosswalks) altogether by placing heavy, immobile, concrete barriers which do not merely limit access to automobile traffic, but instead completely restrict that traffic altogether.

40.     Additionally, in locations where Defendants do not place concrete barriers, they utilize metal police stanchions which are not absolutely immobile, but that are still physically difficult or impossible to move for the disabled, particularly disabled seniors, who are often too frail to lift or move the stanchions or who are at significant risk of injuring themselves in an attempt to move these obstacles. Often, Defendants place multiple barriers to obstruct a street, making entrance and egress even more difficult.

41.     Defendants do not just block the streets for limited hours on sunny days when pedestrians and cyclists want to avail themselves of these blockaded spaces. Instead, in some cases Defendants arbitrarily shut down the designated street zones outside of DOT-authorized days and times, whether in sunny or inclement weather, as well as when it is raining, snowing, icy or

otherwise precipitating. Moving stanchions and being required to get in and out of their vehicle multiple times under these slippery and hazardous conditions is even more difficult and dangerous for disabled residents of the community seeking to move their vehicles through the barricaded areas.

42. Many of the Plaintiffs suffer from disabilities which impair their mobility, strength and endurance. They are reliant upon automobiles in order to go grocery shopping, go to medical appointments, to attend social activities, and to generally live their lives independently and with dignity. Because the Program effectively forecloses free use of automobiles on the affected streets, these Plaintiffs cannot engage in the aforementioned activities.

43. For similar reasons, rideshare services and Paratransit vehicles cannot deliver unfettered services to the disabled residents of closed street areas. Their drivers usually do not wish to, and are often prohibited by their employers, from exiting vehicles to move barricades because that would leave their passengers, including the disabled, unattended. Additionally, these transportation providers typically use GPS services, and those GPS services now identify the closed street areas as closed to vehicle traffic, which frequently results in rideshare and Paratransit drivers refusing to make pickups or drop offs for residents in the affected areas. Where they don't outright decline the trip, the drivers will be unable to make curbside pickups or drop offs, which necessitates that Plaintiffs walk distances that are beyond their ability, or stamina, or that expose them to danger (e.g., falling), particularly in inclement weather.

44. Additionally, although Program documents indicate that the closed street areas will permit a 15 foot berth in order to allow emergency vehicles to access the streets when necessary, in practice, that Program requirement, as well as the NYC Fire Code 503.2.3, are often ignored. The New York City Fire Code (*see* hyperlink: [Fire Apparatus Access Road](#); *see also* hyperlink:

Obstruction).  As a result, Plaintiffs and their families are at increased risk when they require emergency services because those services will be delayed or unable to get to them in timely fashion due to Defendants' obstructions of the closed street areas.

45.     The City has allowed the community organizations designated as defendants in this action to apply to administer the Program in designated street areas.  Each of the other defendants identified herein have applied for, and have been granted by the City, the right to administer the Program.  The additional defendants purport to provide "Volunteers" to accommodate the disabled by moving barriers out of the way, as needed.  However, these Volunteers are typically not interested in accommodating the disabled and are, instead, climate and/or environmental activists interested in eliminating the automobile from modern society.  Many of these "Volunteers" have taken it upon themselves to harass and yell at people who have attempted to drive their cars through the areas blocked off by the Program by moving the barriers on their own in order to reach their residence or destination.

46.     Defendants' actions in shutting down streets throughout New York City, and installing immovable barricades, police stanchions, and other "Traffic Calming" mechanisms constitute either "Alteration" or "New Construction" within the meaning of the ADA, which requires that Defendants adhere to the ADA Title II Regulations codified at 28 CFR part 35.151. However, upon information and belief, in enacting and administering the Program, Defendants did not take any material steps to ensure the Program's compliance with the ADA and, to date, they have still not done so.

47.     On April 7, 2021, Shannon Phipps ("Phipps"), of Berry St. Alliance (a local resident who was nine months pregnant at the time) organized a meeting regarding the Program with members of the DOT, residents of various Open Streets, Defendant Kevin LaCherra, Defendant

Noel Hidalgo and Kyle Gorman ("Gorman") of Defendant NBKOSCC, and Katie Denny Horowitz of Defendant NBK Parks. At this meeting, Phipps discussed how the Program violated the rights of the disabled. Gorman brushed off Phipps' concerns without addressing them saying "I have heard enough from you."

48.     On October 8, 2021, during another meeting organized by Phipps attended by NYS Assembly Emily Gallagher, Council Member Lincoln Restler and Brooklyn Borough Commissioner Keith Bray regarding the Program, Phipps again discussed how the Program violated the rights of the disabled, and in particular how the use of barricades violated the ADA. Bray simply stated that the DOT disagreed with that assessment.

49.     On April 14, 2022, during a Brooklyn Community Board 2 Transportation & Public Safety Committee meeting, Phipps again confronted Gorman about the disability discrimination issues that the barricades caused.

50.     On November 2, 2022, during a 94th Precinct Community Partners Meeting Phipps again discussed how the Program violated the rights of the disabled, and in how the use of barricades violated the ADA. She told Emily Weidenhof, NYC DOT Director of Public Space, and Rhonda Messer, Director of Community Affairs, that the barricades must be collected off the streets immediately.

51.     On May 4, 2021, Shelly Brevda ("Brevda") emailed Jason Barney ("Barney") and John O'Neill ("O'Neill"), both of the DOT, and Gorman, via openstreets@dot.nyc.gov.  The email stated, "Neighbor can't be dropped in front of home on 34th Ave. The Open Street Project on 34th Avenue is harming and endangering our elderly and disabled. It is shame that this is the situation now not matter what the ADA calls for."

52. On October 19, 2021, Brevda emailed Barney and O'Neill again regarding how the Program harmed disabled residents, particularly because Access-A-Ride was prevented access to 34th Avenue. Brevda concluded the email by saying, "Please help."

53. On May 2, 2022, Willoughby Avenue Neighbors United hand delivered and emailed a petition to the DOT which stated, "We need to resolve the ADA issue created by Open Streets that forces residents with mobility issues and their caregivers to walk to cross streets instead of being picked up at their doors by Access-a-Ride and other modes of transportation."

54. On October 24, 2022, during the ribbon cutting for renaming 34th Ave Open Street "Paseo Park," Kathy Farren showed DOT Commissioner Ydanis Rodriguez how concrete barriers and planters blocked Access-a-Ride and/or emergency services access to 78th Street and 34th Avenue. Kathy Farren emphasized that people with disabilities live there and need access.

55. From 2020 through 2022, residents spoke to the Queens Community Board 3 regarding the hardships that the Program imposed on individuals with disabilities. DOT members and third party partners were present at these meetings.

56. Moreover, the City's "Open Streets 2021 Application" clearly states that an applicant must "provide and maintain a 15 foot emergency lane at all times; where this is not possible, applicants must work with NYC DOT and FDNY further to ensure emergency access at all times." As part of the application, the applicant must submit a site plan "[d]etailing the unobstructed 15 foot emergency lane." Further, the "[e]mergency lane must be a 'straight shot' and cannot curve or otherwise deviate from a consistent course through the entire proposed route."

57. Defendant 34th Avenue Open Streets Coalition submitted planning documents to the City containing a graphic representation of how their Open Street would maintain a 15 foot emergency lane "OPEN AT ALL TIMES." *See* picture below:



58.     On May 12, 2021, Defendant 34th Avenue Open Streets Coalition signed an agreement with the City, under which Defendant received $15,000 in exchange for management and maintenance of the Open Street.

59.     Even though Defendant 34th Avenue Open Streets Coalition knew about the need for 15 foot emergency lanes, 34th Avenue is now littered with large blockades such as concrete blocks and planters that are immovable, many of which obstruct the emergency lane. *See* pictures below:











60.     34th Avenue now also contains large planters that obstruct sidewalk curb cuts, making it impossible for someone using a wheelchair to mount the curb. This impedes the safe and equal access of curbs and sidewalks for individuals with disabilities. *See* pictures below:





61.     Similarly, Defendants North Brooklyn Parks Alliance and NBKOSCC agreed to maintain a 15 foot emergency lane when it applied for Open Street funding from the City. *See, e.g.*, planning document below:



62.     However, the placement of metal police barricades across Berry Street discourages delivery trucks from driving down the street to make deliveries. Instead, these large trucks frequently park in front of the barricades while the delivery-person makes deliveries throughout the block. As a result, the entire street – and thus the mandatory 15 foot emergency lane – becomes completely obstructed. Furthermore, the original two barricades proposed are now increased to three barricades at many intersections. Upon information and belief, Berry Street is an emergency route, making such obstructions even more dangerous. *See* pictures below:















63.     Because the City has closed the designated streets, the food and package delivery trucks that have become a ubiquitous part of urban life have been forced to adapt by necessity, and as a second order effect of the Closed Streets Program, the trucks themselves have created an additional impediment obstructing disabled residents' access to the streets.  And while the City's delegated volunteers and activists might conceivably make some effort to assist the disabled with navigating police barricades and planters blocking the streets, there is no possibility that they would be permitted to move these vehicles by the trucks' operators.

64.     In effect, as stated above, Defendants have transformed public streets and spaces with the Closed Streets Program with no regard for the effect that such alterations and/or new construction have on individuals with disabilities. Further, Defendants have done so fully knowing

that the Program has violated, and continues to violate, the rights of many thousands of residents with disabilities.

**PARTIES**

*Plaintiffs*

65.    Jess Charles ("Mr. Charles") lives on one of the "Open Streets" located in New York, NY 10009. He is an individual with a disability under the ADA.

66.    Krystyna Chuda ("Ms. Chuda") lives on one of the "Open Streets" located in Brooklyn, NY 11249. She is an individual with a disability under the ADA.

67.    Gerard F. Feidner ("Mr. Feidner") lives on one of the "Open Streets" located in New York, NY 10025. He is an individual with a disability under the ADA.

68.    Roslyn Huebener ("Ms. Huebener") lives on one of the "Open Streets" located in Brooklyn, NY 11217. She is an individual with a disability under the ADA.

69.    Mill Jonakait ("Ms. Jonakait") lives in close proximity to one of the "Open Streets" located in Brooklyn, NY. She is an individual with a disability under the ADA.

70.    Carmen Kolodich ("Ms. Kolodich") lives on one of the "Open Streets" located in Jackson Heights, NY 11372. She is an individual with a disability under the ADA.

71.    Richard Kolodich ("Mr. Kolodich") lives on one of the "Open Streets" located in Jackson Heights, NY 11372. He is an individual with a disability under the ADA.

72.    Mary McGuckin ("Ms. McGuckin") lives on one of the "Open Streets" located in Jackson Heights, NY 11372. She is an individual with a disability under the ADA.

73.    Deborah Perrin ("Ms. Perrin") lives on one of the "Open Streets" located in Jackson Heights, NY 11372. She is an individual with a disability under the ADA.

74.    John David Tineo ("Mr. Tineo") lives in close proximity to one of the "Open Streets" located in East Elmhurst, NY 11370. He is an individual with a disability under the ADA.

75.     Krystyna Zablocki ("Ms. Zablocki") lives on one of the "Open Streets" located in Brooklyn, NY 11249. She is an individual with a disability under the ADA.

76.     Tadeusz Zablocki ("Mr. Zablocki") lives on one of the "Open Streets" located in Brooklyn, NY 11249. He is an individual with a disability under the ADA.

*Defendants*

77.     The City of New York (the "City") is a municipality incorporated under the laws of the State of New York. The City has created several agencies, including the DOT, that is the principal focus of this lawsuit.

78.     Upon information and belief, Eric Adams, named in his official capacity as the Mayor of New York City is the political official with chief executive authority over New York City and is ultimately responsible for administering, operating, and maintaining the NYC's public goods and services and compliance with the law.

79.     Upon information and belief, Ydanis Rodriguez, named in his official capacity as Commissioner of NYC DOT, is the political official with authority over the DOT and bears responsibility in his official capacity as Commissioner and is ultimately responsible for administering, operating, and maintaining NYC's public streets, the Open Streets Program and compliance with the law. The DOT is the agency charged with management of New York City's transportation infrastructure, including its streets.

80.     The Horticulture Society ("the Hort") was hired by the Mayor and the DOT respectively to manage the barricades when the coalitions could not get the volunteers needed to manage the barricades or the Program as a whole. The Hort maintains the planters, cleans street and is responsible for setting the barricades out in the street in the morning (start/end times vary by site), removing barricades from street at night and repositioning them into street throughout the

day if they are moved. They are also responsible for retrieving the barricades off Open Streets when the DOT announces a temporary suspension of the program. This is never adhered to by the Hort or any volunteers as they also store the barricades on sidewalks creating another ADA violation, dangerous conditions for pedestrians and unnecessary liabilities for property owners.

81.    North Brooklyn Parks Alliance ("NBK Parks") was formed in 2003 as the Open Space Alliance for North Brooklyn to raise private funds to expand and "improve" open space in North Brooklyn and host entertainment events. NBK Parks relies heavily on monetizing public space. NBK Parks works with the New York City Department of Parks & Recreation, NYC Department of Transportation, New York State Department of Transportation, elected officials and the "so-called community" to maintain, activate, enhance, and expand local parks. Upon information and belief, NBK Parks applied to DOT for authorization to administer a 1.1 mile stretch of Berry Street, in Brooklyn, NY (the "Berry Open Street"), which was designated by DOT as an Open Street pursuant to the Program.

82.    North Brooklyn Open Streets Community Coalition ("NBKOSCC") is a volunteer group that is recognized by DOT as a managing partner authorized to police, place and collect barricades on the Berry Street Open Street.

83.    North Brooklyn Mutual Aid ("NBKMA") is a volunteer group that provides staffing to NBKOSCC for the purpose of policing, placing and collecting barricades on the Berry Street Open Street.

84.    Fort Greene Open Street Coalition ("FGOSC") is a volunteer group that is recognized by DOT as a managing partner authorized to police, place and collect barricades on Open Streets in the Fort Greene area of Brooklyn.

85.     Loisaida Open Street Community Coalition ("LOSCC") is a volunteer group that is recognized by DOT as a managing partner authorized to police, place and collect barricades on the Avenue B Open Street between 6th and 14th Street in Manhattan.

86.     W103 Open Street Community Coalition ("W103 OSCC") is a volunteer group that is recognized by DOT as a managing partner authorized to police, place and collect barricades on the Open Street running along West 103rd Street from Riverside Park to Broadway, in Manhattan.

87.     34th Avenue Open Streets Coalition ("34th Ave OSC") is a volunteer group that is recognized by DOT as a managing partner authorized to police, place and collect barricades on the Open Street running along 1.3 miles of 34th Avenue in Jackson Heights, New York.

88.     Noel Hidalgo is, on information and belief, the principal of NBKOSCC.  In his capacity as principal and founder of NBKOSCC, Mr. Hidalgo is responsible for organizing NBKOSCC's placing and collecting barriers on the Berry Street Open Street.  Mr. Hidalgo manages, and recruits volunteers and communicates on social media as a representative of NBKOSCC. Mr. Hidalgo is a resident of Greenpoint not Williamsburg.

89.     Clara Smith is, on information and belief, the principal of NBKOSCC.  In her capacity as principle of NBKOSCC, Ms. Smith is responsible for organizing NBKOSCC's placing and collecting barriers on the Berry Street Open Street. Ms. Smith is a resident of Greenpoint not Williamsburg.

90.     Kevin LaCherra is, on information and belief, the principal of NBKOSCC.  In his capacity as principal of NBKOSCC, Mr. LaCherra is responsible for organizing NBKOSCC's placing and collecting barriers on the Berry Street Open Street.  Mr. LaCherra is a resident of Greenpoint not Williamsburg.

91.     Jeffrey Hodsdon is a "member" of NBKOSCC.  In his capacity as a "member" he acts as a "volunteer" and regularly places and guards the barricades in the street at the location of North 7th Street and Berry Street in order to obstruct automobile access to the Berry Street Open Street, including that of local residents.  Mr. Hodsdon is also responsible for using spray paint to mark the Berry Street Open Street with "NBKOPENSTREETS.ORG," which, upon information and belief, is NBKOSCC's web page, which in turn directs visitors to a petition created by registered lobbyist group "Transportation Alternatives" to close Berry Street to automobile traffic.

92.     Nuala O'Doherty-Naranjo is, on information and belief, the principle of 34th Ave Open Streets Coalition. In her capacity as principal of 34th Ave Open Streets Coalition, Ms. O'Doherty-Naranjo is responsible for organizing and facilitating 34th Ave Open Streets Coalition placing and collecting barriers on 34th Ave Open Street.

93.     Jim Burke is, on information and belief, the principle of 34th Ave Open Streets Coalition. In his capacity as principal of 34th Ave Open Streets Coalition, Mr. Burke is responsible for organizing and facilitating 34th Ave Open Streets Coalition placing and collecting barriers on 34th Ave Open Street.

94.     JOHN & JANE DOES 1-99 are the volunteer members of the Defendant organizations identified above who place barriers on the Open Streets and/or administer Open Streets programs pursuant to grants of authority to the Defendants, above, and who thus actually exercise the police power delegated to the Defendants by DOT.

**FACTUAL BACKGROUND**

95.     The individual plaintiffs identified below are all disabled individuals who have been harmed by the City's Open Streets Program.

*Facts Relevant to the Individual Plaintiffs*

***Jess Charles***

96.     Mr. Charles lives on Avenue B, an Open Street. He is 94 years old. He was diagnosed with Addison's Disease about twelve years ago. In that time, he has been hospitalized about a dozen times to treat the disease, with increasingly more hospital visits over the last few years. He often has doctors come to his home for in-person visits for x-rays, blood tests, and other medical evaluations.

97.     Mr. Charles has fallen multiple times in recent years and has fractured his first and second vertebrae, as well as a bone in his lumbar. In his most recent fall, on October 16, 2022, Mr. Charles required an ambulance. The paramedics on the ambulance needed to scramble to remove the barricades on Mr. Charles' street. Mr. Charles fears that he may need an ambulance again in the future, but the barricades will prevent or delay access.

98.     Walking is very difficult for Mr. Charles because of his disabilities. He uses a walker for balance, but his endurance and strength are very limited. He relies on car services for transportation to medical appointments and social occasions, but the drivers rarely come to Mr. Charles' door to pick him up. As a result, Mr. Charles must walk nearly two blocks to the corner.

*Krystyna Chuda*

99.     Ms. Chuda lives on Berry Street, an Open Street. She has had heart, spine, and multiple foot surgeries. Complications from foot surgery have left her with an open wound that still has not healed properly. As a result of her disabilities, Ms. Chuda goes to her doctors one to two times per week. She also has follow-up appointments at the hospital for her various surgeries. Ms. Chuda has been suffering from chronic pain for multiple years and receives medical care for pain management.

100.    Walking is very difficult and painful for Ms. Chuda. A basic task like walking to the store and carrying home her groceries is impossible for her. So, Ms. Chuda typically drives.

However, Ms. Chuda struggles to move the barricades when attempting to drive to her home. Further, she regularly experiences harassment when she drives on Berry Street.

101.    Even if Ms. Chuda could move the barricades, sometimes access is blocked for her anyway. For example, in 2021, Mr. Zablocki and his daughter Kinga Zablocki ("Kinga") were driving Ms. Chuda home from the hospital after a foot surgery. A delivery truck parked in front of the barricades, thus completely blocking access to her street. Kinga had to help Ms. Chuda – who was in considerable pain from the surgery – walk down the block to her apartment.

102.    Ms. Chuda's son, Adam Chuda, lives with her. Adam has diabetes, which has impacted his feet. He recently had a toe amputated. Ms. Chuda fears that the Open Streets barricades will delay or prevent emergency services for either her or her son.

### Gerard F. Feidner

103.    Mr. Feidner lives on 103rd Street, an Open Street. He is 68 years old and has been diagnosed with coronary artery disease ("CAD"), peripheral artery disease ("PAD"), and diabetes. In 2002, he had quadruple bypass heart surgery to repair what would have led to a "widow maker" heart attack. He has stents in his heart, spleen, stomach, legs, and kidneys. He is at increased risk of stroke and has undergone two carotid endarterectomies to remove plaque from his carotid artery. He also has an abdominal aortic aneurysm ("AAA"). Moreover, Mr. Feidner has diabetes, which has led to neuropathy in his ankles and feet. This makes him prone to falling.

104.    Mr. Feidner has difficulty walking because his legs often cramp or become numb because of his various disabilities. He uses a cane for balance.

105.    Mr. Feidner drives to his medical appointments and for his errands. However, the Open Streets barricades make these ordinary tasks exceptionally difficult for Mr. Feidner. He cannot move the barriers himself. His cardiologist recommends that he not lift anything more than

10 pounds, to avoid excess stress on his chest, and the barricades are far heavier than that. Dragging the barricades is impossible for Mr. Feidner as well because he lacks strength in his legs and struggles with balance. Even getting in and out of his car to remove the barricades is difficult for Mr. Feidner.

106.     Mr. Feidner fears that the barricades will delay access of emergency vehicles. If his AAA ruptures, he will bleed to death in 20 minutes. Any delay in emergency services in this scenario could be the difference between life or death for Mr. Feidner.

**Roslyn Huebener**

107.     Ms. Huebener lives on the corner of Lafayette Avenue and South Portland Avenue, an Open Street. She is elderly and suffers from Ankylosing Spondylitis, an incurable degenerative spinal disease. This disease caused an ossified spine which may become worse or fracture from physical stress.

108.     Ms. Huebener needs to drive almost daily for work and other obligations. However, to drive down the Open Street requires moving the barricades at each end, which is difficult and dangerous for her given her age and disability.

109.     Ms. Huebener owns a building on the corner of Adelphi Street and Willoughby Avenue, an Open Street. She frequently must access the driveway of this building for work.  This involves moving another barricade to enter the block.

**Mill Jonakait**

110.     Ms. Jonakait is nearly 77 years old. She was born with focal femoral deficiency in her right leg, which means that she was born without a femur. As a result, her right leg is about 10 inches shorter than her left and her right hip is weak.  She can walk using a leg brace, but she does

so with a limp. Walking is a slow, difficult process, and she becomes fatigued after walking more than a couple of blocks.

111.    Ms. Jonakait lives on Carlton Avenue, approximately three blocks away from Willoughby Avenue and South Portland Avenue, both Open Streets.

112.    Ms. Jonakait drives because walking is so difficult for her. However, since Willoughby Avenue and South Portland Avenue have become Open Streets, the available parking on her street has dramatically decreased. Ms. Jonakait is frequently unable to find parking on her block during the week. As a result, she often must park at least three blocks away. It is difficult and exhausting for Ms. Jonakait to walk this far back to her apartment. It is impossible for Ms. Jonakait to walk that distance carrying groceries. Further, Ms. Jonakait feels unsafe walking such long distances because of her limp, general fatigue, and the often cracked and uneven nature of the sidewalks.

### Carmen Kolodich

113.    Ms. Kolodich lives on 34th Avenue, an Open Street, with her husband, Mr. Kolodich. She is 70 years old. In August 2014, Ms. Kolodich had a heart attack. As a result, she had a stint put in her heart. This impacts her stamina, making it difficult to breathe and walk, especially over long distances. Ms. Kolodich also has various back and leg impairments. She has scoliosis, as well as arthritis and herniated disks in her back. She has had two knee replacements and will soon undergo hip replacement surgery. Ms. Kolodich's various disabilities make it difficult for her to walk, balance, or even stand for more than a few minutes. She relies on a cane while walking. She is in pain constantly.

114.    Ms. Kolodich generally relies on driving to bring herself and Mr. Kolodich to their respective medical appointments. She is not strong enough to lift the barricades that block access

to her street. She can drag them so that her car can pass, but even this is difficult and dangerous for her. She fears slipping and falling while moving the barricades because of her strength and balance deficiencies. Thus, moving the barricades is even more dangerous for Ms. Kolodich when it rains or snows.

115.    Sometimes, delivery trucks park in front of the barricades. On these occasions, Ms. Kolodich loses access to her block entirely.

116.    In February 2022, Ms. Kolodich's daughter called an ambulance for her when Ms. Kolodich had such severe back pain that she could not stand, sit, or walk. Ms. Kolodich fears that she may be need an ambulance or other emergency service in the future, and that the barricades will delay or prevent access.

117.    Occasionally, Ms. Kolodich uses car services like Access-a-Ride. However, these services will not move the barricades to pick her up at her door. Instead, Ms. Kolodich must walk half a block to the corner of 34th Avenue and 76th Street to meet her ride. Walking this distance is difficult and dangerous for Ms. Kolodich, especially if it has rained or snowed.

118.    Ms. Kolodich has been harassed by pedestrians, city employees, Open Streets activists or volunteers, on the street merely for coming and going to her home. Pedestrians sometimes intentionally block her car or deliberately walk slowly, and have other times taken pictures of her.

***Richard Kolodich***

119.    Mr. Kolodich lives on 34th Avenue, an Open Street, with his wife, Mrs. Kolodich. He is a former NYPD officer, retired on disability. He has multiple herniated discs in his back, and a herniated disc and nerve damage in his right shoulder. He has four stents in each leg and has undergone surgery for one leg. He has seven stents in his heart. He uses a cane to walk but can

only walk very short distances before experiencing pain. Like his wife, he is unable to lift the barricades and struggles to drag them, especially in the rain or snow.

120.     In January 2022, Mr. Kolodich suffered a rupture in his stomach and nearly bled to death. An ambulance arrived at his street but was prevented access by the barricades. It was not until someone from his block moved the barricades that the ambulance drove to Mr. Kolodich's home. Mr. Kolodich required five blood transfusions to survive. Mr. Kolodich would have died if the ambulance had been delayed by just a few more minutes. Mr. Kolodich fears that he may need an ambulance again in the future, and that the barricades will again delay or prevent access.

121.     Like his wife, Mr. Kolodich has also experienced harassment by pedestrians, city employees, Open Streets activists or volunteers, simply for coming and going to his home. He has also witnessed delivery trucks parked next to the barricades, thus completely blocking access to the block.

### Mary McGuckin

122.     Ms. McGuckin lives on 34th Avenue, an Open Street. She is 64 years old. She suffers from Spinal Stenosis, a painful inflammation of the spine nerve. She has a Biotronics insert attached to her heart. She also has cerebral meningioma, i.e., a brain tumor, that puts her at risk of seizures. Ms. McGuckin regularly sees a cardiologist, neurologist, pulmonologist, and primary care physician to treat her various disabilities. She takes medications prescribed by her medical care providers.

123.     Because of her various disabilities, Ms. McGuckin has difficulty walking and uses a cane or walker. Further, she does not drive. Instead, she relies on her husband to drive her to, among other things, her medical appointments. Her husband is 70 years old, and moving the

barricades is difficult for him. If her husband is unavailable, Ms. McGuckin relies on car service providers for transportation.

124.     Car service providers are reluctant to drop Ms. McGuckin off or pick her up at her apartment, because of the barricades. When this happens, Ms. McGuckin is forced to walk to and from the corner, which is difficult and painful for her because of her disabilities.

125.     People on the street, city employees, Open Streets activists or volunteers, have yelled at her and attempted to block her car. As a result, Ms. McGuckin is afraid of her own block. People have also harassed her car service providers, making these providers even less likely to drop Ms. McGuckin off or pick her up at her apartment.

### Deborah Perrin

126.     Ms. Perrin is a senior citizen who resides on 34th Avenue, an Open Street. She suffers from kidney disease and is currently undergoing dialysis treatment three times per week. To facilitate dialysis, she has an AV fistula in her arm. The AV fistula makes it dangerous for her to lift or move heavy objects, because she risks rupturing her skin which can lead to significant blood loss.  Ms. Perrin also has neuropathy in her feet and spinal stenosis, both of which make walking difficult and painful for her.

127.     To park on her block, Ms. Perrin must move a barricade. This is difficult and dangerous for Ms. Perrin because of the AV fistula in her arm, and the general fatigue she experiences following dialysis.

128.     Ms. Perrin sometimes uses car services, such as Access-A-Ride. However, these car services refuse to come to the front of Ms. Perrin's building because they will not move the barricades. Instead, Ms. Perrin is forced to walk to the corner, which is difficult and painful for her because of her disabilities.

129.    Before 34th Avenue became an Open Street, Ms. Perrin's deliveries from companies like UPS and FedEx came to her apartment door. Now, because the delivery trucks park at the corner, the companies leave her packages in the building lobby. Ms. Perrin struggles to carry heavier packages up to her apartment.

***John David Tineo***

130.    Mr. Tineo suffers from various disabilities. In 2015, he had a stent put in his heart after doctors discovered three blood clots in his heart. In April 2017, he suffered an aortic dissection, for which he underwent open heart surgery. The surgery led to complications. He developed drop-foot syndrome because of the five weeks he spent in bed recovering. Drop-foot syndrome causes Mr. Tineo's foot to drop on its own while walking, which makes it difficult for him to walk over curbs or uneven sidewalks. He also developed a MRSA infection in his heart because of the surgery. Mr. Tineo underwent another open-heart surgery in December 2017 to treat the MRSA infection, which nearly killed him. After this second surgery, Mr. Tineo developed balance and strength issues. Mere standing is very difficult for him, and if he falls, he has trouble getting back up because of his weakened legs. Also, his doctors prescribed a weight limit for him, and recommended that he not move anything over eight pounds. Finally, Mr. Tineo has had asthma since he was two years old. He uses two inhalers, a bypass machine, and oxygen to treat the condition. During the winter, Mr. Tineo's asthma becomes worse, and it is even harder for him to walk and move things.

131.    Mr. Tineo lives on 78th Street in East Elmhurst. His wife's parents live on 34th Avenue between 76th and 77th Street, an Open Street, which is about seven blocks away from his home. He frequently visits them for various reasons. Because of his drop-foot syndrome, asthma, and balance issues, Mr. Tineo drives to their home instead of walking. However, he is frequently

unable to park at their home because he cannot move the heavy barricades. One time, Mr. Tineo attempted to move a barricade, and he fell. Other times, when he has someone in the car with him who can move the barricade, he has faced harassment from pedestrians, city employees, Open Street activists or volunteers, on the Open Street.

132.     When Mr. Tineo cannot park in front of his in-laws, he is forced to park anywhere from one to three blocks away. Walking such a distance is difficult and dangerous for him, given his various disabilities. Mr. Tineo has tripped while walking before.

133.     Mr. Tineo fears for the safety of his in-laws, who are 70 and 75 years old. His father-in-law has been diagnosed with Parkinsons. The Open Street may slow or completely prevent access of emergency vehicles such as ambulances or fire trucks.

*Krystyna Zablocki*

134.     Ms. Zablocki is seventy-one years old and lives on Berry Street, an Open Street. She lives with her husband, Mr. Zablocki. In 2014, Ms. Zablocki fell and fractured bones in her right hand, which is her dominant hand. Since then, she has lost grip strength in her right hand, which is exacerbated by her osteoporosis. Basic activities like lifting light objects are difficult for her. The metal barricades at the end Berry Street, which are quite heavy, are too heavy for her to move.

135.     Delivery drivers sometimes park in front of the barricades while they deliver packages on the block. This can last anywhere from 20-45 minutes. When this happens, Ms. Zablocki is prevented completely from returning to her home.

136.     In December 2021, Ms. Zablocki suffered a serious case of COVID-19 and needed to be hospitalized. Her daughter, Kinga, attempted to drive to Ms. Zablocki's home to bring her to the hospital. When Kinga approached Berry Street, a pedestrian, city employees, Open Street

activist or volunteer, blocked her car and delayed her from picking up Ms. Zablocki, even though Kinga told him that she was going to the hospital.

*Tadeusz Zablocki*

137.    Mr. Zablocki is 72 years old and lives on Berry Street, an Open Street. He underwent quadruple bypass heart surgery in 2008. Around 2019, he suffered a major heart attack, for which he needed an ambulance to bring him to the hospital. After that, he had a stent, a pacemaker, and a defibrillator put into his heart. Mr. Zablocki suffered another heart attack in November 2022. Because of Mr. Zablocki's documented history of heart failure, his doctors have advised him to avoid lifting heavy objects and to generally avoid stress.

138.    Mr. Zablocki is a repair person and needs to get in and out of his home several times a day. However, because of his heart condition, moving the barricades is difficult and dangerous. Further, pedestrians, or volunteers, regularly harass Mr. Zablocki simply for driving down the street to his home.

139.    Mr. Zablocki – who has already had two heart attacks – fears that he may have another one in the near future, and that an ambulance will be delayed or completely obstructed by the barricades.

## FIRST CAUSE OF ACTION

### (Violation of Title II of the Americans with Disabilities, 42 U.S.C. § 12132)

140.    Plaintiffs hereby repeat and reallege each and every allegation in the foregoing paragraphs as if set forth fully herein.

141.    Plaintiffs are qualified individuals with disabilities, as set forth in the Parties section of the Complaint, above.

142.   Defendants are subject to the ADA because the City is a municipality providing public services, and the remaining Defendants have been delegated the power to administer those services and actually do administer those services.

143.   Plaintiffs have been denied the opportunity to participate in and benefit from the City's services, programs or activities related to the provision of streets and sidewalks as a result of the Program and its administration by Defendants, as set forth above.

## SECOND CAUSE OF ACTION

### (Violation of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*)

144.   Plaintiffs hereby repeat and reallege each and every allegation in the foregoing paragraphs as if set forth fully herein.

145.   Plaintiffs are qualified individuals with disabilities, as set forth in the Parties section of the Complaint, above.

146.   Upon information and belief, Defendants are recipients of federal funds and are therefore subject to the Rehabilitation Act.

147.   As set forth above, Plaintiffs have been denied access to city streets, sidewalks, and curb cuts,  solely by reason of their disabilities.

## THIRD CAUSE OF ACTION

### (Violation of 42 U.S.C. § 1983)

148.   Plaintiffs hereby repeat and reallege each and every allegation in the foregoing paragraphs as if set forth fully herein.

149.   Defendants' Program is enacted, implemented, and administered under color of New York State municipal law.

150.	Defendants' Program, and the administration of that Program, deprives Plaintiffs of their rights under federal statutes, including, without limitation, the ADA and the Rehabilitation Act.

## FOURTH CAUSE OF ACTION

### (Violation of New York State Human Rights Law, Executive Law §296(2)(a))

151.	Plaintiffs hereby repeat and reallege each and every allegation in the foregoing paragraphs as if set forth fully herein.

152.	Defendants have acted as the owner (and the agents of the owner) of public accommodations and have, in that capacity, committed unlawful discriminatory practices when they refused, withheld from, or denied Plaintiffs the accommodations, advantages, facilities or privileges thereof on account of Plaintiffs' disabilities.

## FIFTH CAUSE OF ACTION

### (Violation of New York City Human Rights Law, NYC Admin. Code, §§ 8-101 *et seq.*)

153.	Plaintiffs hereby repeat and reallege each and every allegation in the foregoing paragraphs as if set forth fully herein.

154.	Defendants have acted as the provider (and the agents of the provider) of public accommodations and have, in that capacity, refused to provide and pay for reasonable accommodations to allow Plaintiffs, who are disabled individuals, to access those public accommodations.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and award the following relief:

A.	An order granting Plaintiffs appropriate injunctive and declaratory relief enjoining the Open Streets Program;

B. An order granting Plaintiffs reasonable attorneys' fees and expenses and other compensable costs and expenses; and

C. An order granting Plaintiffs such other, further and different relief as the nature of the case may require or as may be determined to be just, equitable and proper by this Court.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues triable as of right by a jury.

Dated:       Garden City, New York
              April 24, 2023

Respectfully Submitted,

*/s/ Matthew L. Berman*
Matthew L. Berman, Esq.
Yolande I. Nicholson, Esq. (of counsel)
**VALLI KANE & VAGNINI LLP**
600 Old Country Road, Suite 519
Garden City, New York 11530
(516) 203-7180 (phone)
(516) 706-0248 (fax)

*Attorney for Plaintiffs*