**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JESS CHARLES, et al., | |
| Plaintiffs, | Case No. 2:23-cv-03108 |
| - v. - | |
| THE CITY OF NEW YORK, et al., | |
| Defendants. | |

**VOLUNTEER DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT**

March 1, 2024

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 2

ARGUMENT ................................................................................................................... 4

I.    None of the Disabilities Discrimination Laws Plaintiffs Cite Requires Parking or
Prohibits Pedestrianization................................................................................... 4

    A.    Plaintiffs Must Show They Were Denied Meaningful Access to Public Services,
Programs, or Activities. ................................................................................. 4

    B.    Plaintiffs Do Not Contend That They Were Denied Equal Access to Vehicular
Travel and On-Street Parking—Only That the City Ceased to Provide Them............... 5

    C.    Neither the ADA nor The Rehabilitation Act Requires Fundamentally Modifying
A Pedestrianized Area to Allow Cars to Drive Through It............................................. 8

II.    The Volunteer Defendants Are Not Proper Defendants Under ADA Title II. .................. 9

III.    Plaintiffs' Conclusory Allegations of Receipt of Federal Funds Are Insufficient to
State a Claim Under the Rehabilitation Act, Which in Any Event Does Not Provide
for Individual Capacity Suits. .......................................................................... 10

IV.    Plaintiffs Cannot Use Section 1983 to Salvage Defective ADA Title II and
Rehabilitation Act Claims.................................................................................. 14

V.    The Court Should Decline to Assert Supplemental Jurisdiction Over Plaintiffs' State
Law Claims, But, In Any Event, They Fail. ......................................................... 14

    A.    If It Dismisses the ADA, Rehabilitation Act, And Section 1983 Claims, This
Court Should Decline to Exercise Supplemental Jurisdiction Over Plaintiffs' State
and City HRL Claims ..................................................................................... 15

    B.    Plaintiffs' Claims Under the New York State and New York City Human Rights
Laws Fail for the Same Reasons as Their ADA Claim ............................................... 16

        1.    Plaintiff's State HRL Claims Rise and Fall with Their ADA Claim............................ 16

        2.    Plaintiffs' City HRL Claims Also Fail ....................................................... 16

    C.    The Volunteer Defendants Lacked the Authority to Grant the Requested
Accommodation and Thus Cannot be Held Liable....................................................... 17

CONCLUSION.............................................................................................................. 19

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abadi v. NYU Langone Health Sys.*,
   No. 21 Civ. 11073, 2023 WL 8461654 (S.D.N.Y. Dec. 7, 2023).............................15, 17, 18

*Butler v. St. Stanislaus Kostka Cath. Acad.*,
   609 F. Supp. 3d 184 (E.D.N.Y. 2022) ..............................................................................15

*Cardwell v. Davis Polk & Wardwell LLP*,
   2021 WL 4434935 (S.D.N.Y. Sept. 23, 2021)...................................................................17

*Cook v. Budget Rent-A-Car Corp.*,
   502 F. Supp. 494 (S.D.N.Y. 1980) ...................................................................................12

*Costabile v. New York City Health & Hosps. Corp.*,
   951 F.3d 77 (2d Cir. 2020)................................................................................................14

*DaPonte v. Manfredi Motors, Inc.*,
   335 F. Supp. 2d 352 (E.D.N.Y. 2004), *aff'd,* 157 F. App'x 328 (2d Cir. 2005)....................17

*DeNardi v. DRA Imaging, P.C.*,
   605 F. Supp. 2d 550 (S.D.N.Y. 2009)...............................................................................16

*Disabled in Action v. Bd. of Elections in N.Y.*,
   752 F.3d 189 (2d Cir. 2014)................................................................................................5

*Ehrlich v. Gatta*,
   No. 07 CIV. 11597, 2009 WL 3213715 (S.D.N.Y. Oct. 5, 2009) ...........................................7

*Erasmus v. Deutsche Bank Am. Holding Corp.*,
   2015 WL 7736554 (S.D.N.Y. Nov. 30. 2015) ..................................................................18

*Feltenstein v. City of New Rochelle*,
   No. 14-CV-5434 (NSR), 2019 WL 3543246 (S.D.N.Y. Aug. 5, 2019) ..................................7

*Fortyune v. City of Lomita*,
   766 F.3d 1098 (9th Cir. 2014) ............................................................................................7

*Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*,
   280 F.3d 98 (2d Cir.2001)..........................................................................................10, 14

*Graves v. Finch Pruyn & Co.*,
   457 F.3d 181 (2d Cir. 2006)..............................................................................................16

*Green v. City of New York*,
    465 F.3d 65 (2d Cir. 2006)..............................................................................10

*Hunt v. Univ. of Pittsburgh Med. Ctr., Pinnacle*,
    No. 1:18-CV-01757, 2019 WL 3776545 (M.D. Pa. Aug. 12, 2019) .......................................12

*Jones v. City of Monroe, MI*,
    341 F.3d 474 (6th Cir. 2003) .............................................................................6

*Kirkland-Hudson v. Mt. Vernon City Sch. Dist.*,
    2023 WL 2691622 (S.D.N.Y. Mar. 29, 2023) ........................................................17

*Kornblau v. Dade Cnty.*,
    86 F.3d 193 (11th Cir. 1996) .............................................................................6

*McElwee v. County of Orange*,
    700 F.3d 635 (2d Cir. 2012)..............................................................................5

*Means v. St. Joseph Cnty. Bd. Of Comm'rs*,
    No. 3:10-CV-003 JD, 2011 WL 4452244 (N.D. Ind. Sept. 26, 2011).....................................7

*Morales v. New York*,
    22 F. Supp. 3d 256 (S.D.N.Y. 2014).....................................................................10

*Morse v. JetBlue Airways Corp.*,
    941 F. Supp. 2d 274 (E.D.N.Y. 2013) ..................................................................16

*Motorola Credit Corp. v. Uzan*,
    388 F.3d 39 (2d Cir. 2004)..............................................................................15

*Nat'l Collegiate Athletic Ass'n v. Smith*,
    525 U.S. 459 (1999)................................................................................11, 12

*Plasencia v. City of New York Dept. of Educ.*,
    2023 WL 6161928 (S.D.N.Y. Sept. 21, 2023)........................................................17

*Roberman v. Alamo Drafthouse Cinemas Holdings, LLC*,
    67 Misc. 3d 182 (N.Y. Sup. Ct. 2020) ................................................................17

*Rodal v. Anesthesia Group of Onondaga, P.C.*,
    369 F.3d 113 (2d Cir.2004)............................................................................16

*Romano v. SLS Residential Inc.*,
    246 F.R.D. 432 (S.D.N.Y. 2007) ......................................................................16

*Schiffman v. Epstein*,
    04-CV-2661, 2009 WL 1787760 (S.D.N.Y. June 23, 2009) .......................................14, 15

*Sharer v. Oregon*,
581 F.3d 1176 (9th Cir. 2009) ...................................................................12, 13

*Shipman v. Delaware*,
No. CV 19-1713 (MN), 2020 WL 433992 (D. Del. Jan. 28, 2020)...........................7

*Sullivan v. Study.com LLC*,
18-CV-1939 (JPO), 2019 WL 1299966 (S.D.N.Y. Mar. 21, 2019)........................17

*T.W. v. New York State Bd. of L. Examiners*,
996 F.3d 87 (2d Cir. 2021)..........................................................................11

*Taibi v. Borough of Slatington*,
No. CV 18-00385, 2018 WL 6173366 (E.D. Pa. Nov. 26, 2018)........................12

*Tennessee v. Lane*,
541 U.S. 509 (2004)......................................................................................8

*Tolliver v. Xerox Corp.*,
918 F.2d 1052 (2d Cir. 1990)......................................................................12

*U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*,
477 U.S. 597 (1986)...............................................................................11, 13

*Wright v. Giuliani*,
230 F.3d 543 (2d Cir. 2000).........................................................................6

**Statutes**

28 U.S.C. § 1367.....................................................................................14, 15

29 U.S.C. § 794.................................................................................... *passim*

42 U.S.C. § 1983.........................................................................2, 4, 14, 15

42 U.S.C. § 12131......................................................................................9

42 U.S.C. § 12132....................................................................................5, 9

New York Executive Law § 296...................................................................16

**Other Authorities**

36 C.F.R. Part 1190 & Appendix (2023) .........................................................8

*Brief for the United States as Amicus Curiae, Fortune v. City of Lomita*, 2013 WL
526320 (9th Cir., filed Jan. 29, 2013) .......................................................7

Federal Highway Administration, *Accessible Shared Streets: Notable Practices and Considerations for Accommodating Pedestrians with Vision Disabilities* 15-16 (2017), https://www.fhwa.dot.gov/environment/bicycle_pedestrian/publications/accessible_shared_streets/fhwahep17096.pdf ...................................................................................9

# INTRODUCTION

This case is fundamentally a dispute between opponents of a City program to pedestrianize and designate for non-motorized activity certain streets and the City. Plaintiffs complain that the City's program constitutes disability discrimination because—even though the program enables more and safer street access for many people with disabilities by limiting speeding traffic— that the program hinders Plaintiffs' ability to park their cars.. Perhaps displaying the real goal here, the supposed "accommodation" they seek, at least according to their prayer for relief, is to enjoin the City's entire Open Streets program—apparently as to everyone, not just as to them. But their claims fail for the additional reason that rather than simply sue the City, Plaintiffs have chosen to also bring claims against a laundry-list of current and former volunteers, largely based on cookie-cutter allegations that they supposedly manage the City's program and entirely conclusory allegations that they receive federal funds.

The entire case can be disposed of for a simple reason: neither the ADA nor the Rehabilitation Act nor any of the state or local laws Plaintiffs rely upon require cities to provide any particular amount of parking on public streets or restrict pedestrianization of streets. Notably, the U.S. Access Board's Public Right of Way Accessibility Guidelines do *not* require provision of *any* parking at all—they merely regulate the number of spaces required to meet accessibility standards if parking is provided. Put simply, disability discrimination laws are neutral as to transportation modes; they do not require the City to maintain automobile access to every street or create requirements for parking spaces just because some people with disabilities drive in the City, much as courts have long held that they do not require suburbs to add sidewalks to every street just because some people with disabilities do not or cannot drive in the suburbs.

But quite aside from that, even if the case proceeds against the City, the claims against the Volunteer Defendants fail for a number of additional reasons.

*First*, it is settled law that the *only* proper defendant in an ADA Title II action is the municipality itself; no matter what their role in "administer[ing]" public services, private individuals cannot be sued under Title II. The Second Circuit has directly rejected the theory that an individual or private entity can ever be a proper defendant under Title II of the ADA.

*Second*, Plaintiffs' Rehabilitation Act claims fail because their allegations of receipt of federal financial assistance are entirely conclusory. Plaintiffs have failed to allege what federal funds each defendant supposedly received,  on an ongoing basis and failed to separately allege that those funds are direct subsidies rather than reimbursement for services, as required to show that the Volunteer Defendants agreed to be subject to the Rehabilitation Act conditions on federal subsidies. Plaintiffs' failure to do so is fatal to their claims.

*Third*, Plaintiffs cannot escape any limitations on ADA Title II or the Rehabilitation Act by repleading those claims under Section 1983. Controlling Second Circuit authority—which Plaintiffs do not cite—directly so holds. This claim is utterly meritless.

*Finally*, as to the state law claims, the Court should decline supplemental jurisdiction, but in any event, the claims fail for the same reasons as the ADA and Rehabilitation Act claims, and for the additional reason that Plaintiffs do not plead sufficient managerial authority in their group-pleaded complaint that never specifies how any particular plaintiff was harmed by any particular defendant.

## BACKGROUND

Shorn of the political rhetoric, Plaintiffs' complaint alleges that the City runs the "Open Streets Program," which readjusts access to a small number of City streets to among persons traveling by foot, in private motor vehicles, or in other ways. Am. Compl. ¶¶ 1-3, 87-90. It is not

alleged that the program discriminates on its face based on disability, but Plaintiffs claim that they as disabled persons can only access the streets by using motor vehicles. *Id.* ¶¶ 4, 6-7, 11. Plaintiffs apparently believe the City has a duty to provide unhindered, 24/7 door-to-door motor vehicle access to all streets designated for motor vehicles if any person with a disability will be adversely affected by failing to do so. *See, e.g., id.* ¶¶ 13, 95-98. They contend that the City is required by federal law to provide direct motor vehicle access to all "accessible elements and spaces" in the City at all times, which their allegations implicitly seem to assume also requires on-street parking. *Id.* ¶ 14.

Plaintiffs concede that at least some Open Streets are shared streets that are supposed to allow local and emergency vehicle access, but complain that the barriers to separate the pedestrianized area are too difficult to move. Am. Compl. ¶¶ 93, 103-04. Plaintiffs allege that at unspecified times, barriers or planters have been in the wrong places or deployed at times when they supposedly should not have been. *Id.* ¶¶ 105-06, 124. Plaintiffs also complain that rideshare drivers and delivery drivers have been refusing to go all the way to their front doors, *id.* ¶ 108, and that some delivery drivers park illegally in places that block off streets, *id.* ¶ 127.

Plaintiffs also claim that the city has "unlawful[ly] delegate[ed]" its "police power authority" to "Transportation Alternatives 'activists', community organizations and their volunteers" who, in Plaintiffs' words, "police" the areas that the City has allocated for pedestrian and non-motorized vehicle travel. Am. Compl. ¶ 12. They do not allege that this "polic[ing]" involves arresting or citing anyone; rather, charitably interpreted, they allege that these groups and individuals have some discretion in exactly where to put the barricades that separate areas designated for vehicular travel and pedestrianized areas. Am. Compl. ¶¶ 34-44. For many of these Volunteer Defendants, Plaintiffs spend considerably more time complaining about their

policy advocacy, public speaking, social media posts, and other protected First Amendment activity than saying exactly how they harmed any particular Plaintiff or how they would have authority to implement the relief Plaintiffs seek.[1] *Id.*; *see also id.* ¶ 110. Plaintiffs recite the general directions that the City makes volunteers agree to. *Id.* ¶¶ 139-144. Plaintiffs make the same conclusory allegation that each Volunteer Defendant "is a recipient of federal funds, indirectly through grants from DOT of funding provided to it by the federal government." Am. Compl. ¶¶ 34-44.

Plaintiffs—who have now amended their complaint to remove, among other things, a photograph of George Orwell—now bring claims against the City and the Volunteer Defendants alike for (i) violation of Title II of the ADA; (ii) violation of the Rehabilitation Act; (iii) violation of Section 1983; (iv) violation of the New York State Human Rights Law ("NYSHRL") ; and (v) violation of the New York City Human Rights Law ("NYCHRL," together with NYSHRL, the "HRL Claims"), in each case based on failure to accommodate. They seek an injunction against the entire Open Streets Program and attorneys' fees and costs.

## ARGUMENT

I. **None of the Disabilities Discrimination Laws Plaintiffs Cite Requires Parking or Prohibits Pedestrianization.**

    A. **Plaintiffs Must Show They Were Denied Meaningful Access to Public Services, Programs, or Activities.**

---

[1]     While Plaintiffs' allegations are taken as true on a motion to dismiss, on a number of occasions, they allege things that they have been informed are false. For example, Plaintiffs allege that Noel Hidalgo, who volunteered with NBKOSCC during the pandemic, still runs it and still decides where to place barriers. Am. Compl. ¶ 38. He does not. As Plaintiffs have been told repeatedly, Mr. Hidalgo stopped volunteering on the Berry Street Open Street before the subject period and presently limits his involvement to posting on social media in support of the Open Streets program.

Title II of the ADA—the title governing public entities—provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The "standards adopted by the two statutes are nearly identical," so courts routinely "consider the merits of these claims together." *Disabled in Action v. Bd. of Elections in N.Y.*, 752 F.3d 189, 196 (2d Cir. 2014) (quoting *McElwee v. County of Orange*, 700 F.3d 635, 640 (2d Cir. 2012)).

One element common to both claims is that a plaintiff was "denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant because of" the plaintiff's disability. *Id.* at 196-97 (quoting *McElwee*, 700 F.3d at 640). Public programs must provide "meaningful access" to people with disabilities. *Id.* at 197.

**B.**     **Plaintiffs Do Not Contend That They Were Denied Equal Access to Vehicular Travel and On-Street Parking—Only That the City Ceased to Provide Them.**

However, neither the ADA nor the Rehabilitation Act can be used to challenge the *substance* of public service; they are equal access statutes, not guarantees that municipalities will offer any particular program or service. As the Second Circuit has held, "the disabilities statutes do not require that substantively different services be provided to the disabled, no matter how great their need for the services may be. They require only that covered entities make 'reasonable

accommodations' to enable 'meaningful access' to such services as may be provided, whether such services are adequate or not." *Wright v. Giuliani*, 230 F.3d 543, 548 (2d Cir. 2000).

Plaintiffs' claim fails at this first hurdle. They claim that under the program they cannot "access[] the City's public street services" in their cars, and have less "access to vehicular traffic." Am. Compl. ¶ 2. But non-disabled drivers have their access restricted in precisely the same way—they cannot drive on these particular streets or park on them either. Plaintiffs are, in other words, challenging the City's failure to allow private, door-to-door, 24/7 car travel and on-street parking—they are not alleging that it is provided to some people without disabilities but not to them. This is fatal.

Courts have consistently rejected the theory that municipalities are under an affirmative duty to provide vehicular access or parking—only that when they do provide a service or program, they must design it in a way that it is meaningfully accessible to people with disabilities as well. Thus, the Eleventh Circuit has held that, when a county had a visitor parking lot that complied with ADA design regulations, the fact that it had an employee lot closer to the building did not require that visitors with disabilities be able to park in the employee lot or else be entitled to valet service. *Kornblau v. Dade Cnty.*, 86 F.3d 193, 196 (11th Cir. 1996). Similarly, the Sixth Circuit has rejected the notion that the ADA requires a municipality to "provide [a plaintiff] an all-day parking place in the exact location she requires." *Jones v. City of Monroe, MI*, 341 F.3d 474, 480 (6th Cir. 2003). Rather, exemption from generally-applicable parking regulations is considered as a request for reasonable accommodations, and waiving a one-hour parking limit that had been designed to ensure parking availability for shoppers "would be 'at odds' with the fundamental purpose of the rule." *Id.* What matters is whether Plaintiffs "ha[ve] the same parking options as other non-handicapped individuals," even if that means they

"can either park in free areas even though it may not be convenient, or he can park at a handicapped meter and pay for parking like everyone else." *Shipman v. Delaware*, No. CV 19-1713 (MN), 2020 WL 433992, at *2 (D. Del. Jan. 28, 2020) (finding argument that people with disabilities were entitled to exemption from meters was "legally frivolous").

Courts in this Circuit have similarly rejected the notion that people with disabilities are entitled to unlimited parking availability at a specific place convenient to them. Thus, for example, the Village of Scarsdale was not required to provide more accessible parking spaces at its Metro North station garage than state guidelines required simply because the plaintiff often found the spaces occupied by other people with disabilities and got ticketed for parking illegally elsewhere. *Ehrlich v. Gatta*, No. 07 CIV. 11597, 2009 WL 3213715, at *4 (S.D.N.Y. Oct. 5, 2009). And New Rochelle was not required to provide van-accessible spaces on every floor of a parking deck when applicable regulations permitted them to be grouped together on one floor. *Feltenstein v. City of New Rochelle*, No. 14-CV-5434 (NSR), 2019 WL 3543246, at *3 (S.D.N.Y. Aug. 5, 2019).

Indeed, cities are not required to provide parking *at all*, as the U.S. Department of Justice noted in an *amicus brief* that observed that *if* a city chose to provide on-street parking, a sufficient proportion of spaces must be accessible. *Brief for the United States as Amicus Curiae*, *Fortune v. City of Lomita*, 2013 WL 526320, at *23 (9th Cir., filed Jan. 29, 2013) (citing *Means v. St. Joseph Cnty. Bd. Of Comm'rs*, No. 3:10-CV-003 JD, 2011 WL 4452244, at *6 (N.D. Ind. Sept. 26, 2011)). Following that brief, the Ninth Circuit held that a municipality that provides on-street parking must provide some accessible spaces, but noted that the requirement could be satisfied by "nearby" accessible parking even if it requires people with disabilities to "take a marginally longer route." *Fortyune v. City of Lomita*, 766 F.3d 1098, 1103 (9th Cir. 2014). And

the U.S. Public Access Board—the regulatory board charged with setting guidelines for ADA compliance—notably does *not* require parking or car access, but merely states that *if* parking is provided, a sufficient portion should meet accessibility standards. *See generally* 36 C.F.R. Part 1190 & Appendix (2023).

As set forth above, disability discrimination law does not mandate that a municipality provide streets designated for vehicles and parking spaces to people with disabilities if it provides them to no-one, much in the same way that a wheelchair user could not complain about the lack of a pedestrian path on an expressway. It is provided to no-one; not to some but not to others. That is not a viable disability discrimination claim.

## C. Neither the ADA nor The Rehabilitation Act Requires Fundamentally Modifying A Pedestrianized Area to Allow Cars to Drive Through It.

Moreover, neither the ADA nor the Rehabilitation Act requires fundamental changes to a program. "Title II does not require States to employ any and all means to make [a program or service] accessible or to compromise essential eligibility criteria for public programs." *Tennessee v. Lane*, 541 U.S. 509, 531-32 (2004). Rather, "[i]t requires only 'reasonable modifications' that would not fundamentally alter the nature of the service provided, and only when the individual seeking modification is otherwise eligible for the service." *Id.* at 532. The "reasonable modification" standard "can be satisfied in a number of ways." *Id.* "[I]n no event is" a public entity "required to undertake measures that would," among other things, "effect a fundamental alteration in the nature of the service." *Id.*

Here, the accommodation that Plaintiffs request is allowing them to drive through areas that the City has designated for pedestrians. Much as if Plaintiffs had requested to be exempted from laws prohibiting driving on the sidewalk, that fundamentally alters the nature of a pedestrianized (or non-motorized) street and puts other people at risk. Among other things,

turning a pedestrianized or non-motorized street into one where some cars are allowed would require significant modifications to protect the safety of vulnerable road users. For example, on a "shared street"—one with both cars and pedestrians in the same space—people with vision disabilities need to know where they may encounter cars. *See, e.g.*, Federal Highway Administration, *Accessible Shared Streets: Notable Practices and Considerations for Accommodating Pedestrians with Vision Disabilities* 15-16 (2017), https://www.fhwa.dot.gov/environment/bicycle_pedestrian/publications/accessible_shared_streets/fhwahep17096.pdf (noting that it is "very important for transitions from pedestrian-only space to shared zones to be reliably detectable in a way that enables pedestrians with vision disabilities to correctly interpret the transition"). Simply put, having a car drive through a space that the City has designated for pedestrians fundamentally transforms the space and exposes other vulnerable road users to significant risks.

## II.     The Volunteer Defendants Are Not Proper Defendants Under ADA Title II.

Quite aside from the defects of Plaintiffs' theory that pedestrianized streets must allow motor vehicle access, their ADA claims against the Volunteer Defendants fail even if their claim against the City proceeds, because the Volunteer Defendants simply are not proper defendants in an ADA Title II action.

Title II is clear: a "public entity" is "any State or local government," "any department, agency, special purpose district, or other instrumentality of a State or States or local government," and Amtrak or "any commuter authority." 42 U.S.C. § 12131(1). Title II's prohibition only applies to discrimination "by such entity." 42 U.S.C. § 12132.

It has been settled law for decades that Title II does not permit suits against individuals or against private organizations or entities, whether or not they are performing a public function. The Second Circuit has specifically held that an individual "is not a proper defendant" in an

ADA Title II action, because an individual cannot be "a public entity." *Green v. City of New York*, 465 F.3d 65, 76 (2d Cir. 2006). Nor could a private nonprofit hospital contracting with a municipality to provide services be sued under Title II—it was not within the statutory definition of "public entity." *Id.* at 78-79. The court specifically rejected the argument that performing services under contract with a municipality made a private entity an "instrumentality," under Title II, because that term is "best read as referring to a creature of a state or municipality" and "[a] private hospital performing services pursuant to a contract with a municipality even if it does so according to the municipality's rules and under its direction, is not a creature of any governmental entity." *Id.* at 79.

That is determinative of the Title II claims against the Volunteer Defendants. Like St. Luke's, they are not the City of New York or an entity created by it; they are at most alleged to have performed services under contract with it. They are thus outside the scope of Title II, and Plaintiffs' conclusory allegation that the Volunteer Defendants are "instrumentalities," Am. Compl. ¶ 144, is directly contradicted by binding Second Circuit authority.[2] The only proper defendant under Title II of the ADA here is the City. *See Morales v. New York*, 22 F. Supp. 3d 256, 271 (S.D.N.Y. 2014) ("[T]here is no individual liability here under the Americans with Disabilities Act."); *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, 280 F.3d 98, 107 (2d Cir.2001) (ADA does not provide for individual capacity suits).

III. **Plaintiffs' Conclusory Allegations of Receipt of Federal Funds Are Insufficient to State a Claim Under the Rehabilitation Act, Which in Any Event Does Not Provide for Individual Capacity Suits.**

---

[2]     At the pre-motion conference, Plaintiffs also claimed that the Volunteer Defendants were "state actors"—but they cite no authority whatsoever that such a standard applies under Title II of the ADA, because there is none, and *Green* holds directly to the contrary.

Plaintiffs' attempt to plead claims under Section 504 of the Rehabilitation Act against the Volunteer Defendants similarly founders because they are not federal contractors, and Plaintiffs' baseless conclusory allegations that each defendant "is a recipient of federal funds, indirectly through grants from DOT of funding provided by the federal government" are not enough to salvage a Section 504 claim.

Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service." 29 U.S.C. § 794(a). The Supreme Court has explained that the statute is contractual in nature: "Congress limited the scope of § 504 to those who actually 'receive' federal financial assistance because it sought to impose § 504 coverage as a form of contractual cost of the recipient's agreement to accept the federal funds." *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605 (1986). Mere *benefits* from federal financial assistance to someone else are not enough; "[t]he statute covers those who receive the aid, but does not extend as far as those who benefit from it." *Id.* at 607;. And under the similar "federal financial assistance" scheme of Title IX of the Education Amendments of 1972, the Supreme Court has likewise explained that "[e]ntities that receive federal assistance, whether directly or through an intermediary, are recipients within the meaning of Title IX; entities that only benefit economically from federal assistance are not." *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 468 (1999); *T.W. v. New York State Bd. of L. Examiners*, 996 F.3d 87, 94 (2d Cir. 2021) (citing *NCAA* and finding that the fact that some bar applicants individually receive reimbursements from federal funds did

not constitute direct or indirect receipt of federal financial assistance under the Rehabilitation Act). Moreover, the obligation only applies during the period of receipt of federal financial assistance; it is not enough to allege prior receipt of subsidies. *Taibi v. Borough of Slatington*, No. CV 18-00385, 2018 WL 6173366, at \*5 (E.D. Pa. Nov. 26, 2018) ("[D]iscrimination is not actionable under § 504 if it did not occur within the period that an entity received federal financial assistance.").

.           Conclusorily alleging that a defendant received federal financial assistance does not plausibly plead that a defendant is subject to the Rehabilitation Act. *E.g.*, *Hunt v. Univ. of Pittsburgh Med. Ctr., Pinnacle*, No. 1:18-CV-01757, 2019 WL 3776545, at \*5 (M.D. Pa. Aug. 12, 2019). Extensive case law addresses what sorts of payments are subsidies constituting federal financial assistance and what ones are reimbursements for services at (or below) fair market value that are not. *Id.*; *see, e.g.*, *Cook v. Budget Rent-A-Car Corp.*, 502 F. Supp. 494, 496 (S.D.N.Y. 1980) (holding rental car company was not subject to Rehabilitation Act); *Tolliver v. Xerox Corp.*, 918 F.2d 1052, 1060 (2d Cir. 1990) (government contracts were not federal financial assistance).

           Plaintiffs plead none of this. Indeed, it is not entirely clear what theory they are advancing. At least three theories appear to be suggested, though not specifically alleged: If it is that the City received federal financial assistance and thus all volunteers or service providers on *any* City programs and all City grantees regardless of the grant's funding source are personally subject to the Rehabilitation Act, that is plainly wrong. *See, e.g.*, *NCAA*, 525 U.S. at 468 (entity does not become subject to obligations tied to receipt of federal financial assistance merely because other entities that do receive federal financial assistance made payments to it); *Sharer v. Oregon*, 581 F.3d 1176, 1181 (9th Cir. 2009) (Oregon judiciary's receipt of federal funds and

grants from judiciary budget to public defenders' office did not show that the latter received any regranted federal funds). If it is instead that the City may have provided services at locations suggested by the Volunteer Defendants, then that is (at most) an allegation of benefit like in *Paralyzed Veterans*, not the actual receipt of federal financial assistance. The final interpretation of Plaintiffs' vague theory is that the Volunteer Defendants received subsidies from federal funds on an ongoing basis. But Plaintiffs have not plausibly alleged this. They have not identified what supposed funding the Volunteer Defendants received, when they received it, or from whom. Had Plaintiffs conducted a Rule 11-compliant pre-filing investigation, such information would be readily available (if it exists at all): City spending is publicly available information. Plaintiffs must plausibly plead that any City funding came from federal funds, not state or local funds. See *Sharer*, 581 F.3d at 1181. Even that were alleged—and it is not—Plaintiffs would nevertheless need to plead some facts to show that the supposed financial assistance was a subsidy and not merely a full or partial reimbursement for services provided. They do none of this; they merely recite the statutory label and vaguely intimate that perhaps DOT gave federal money from some unspecified source at some unspecified time to each of the Volunteer Defendants for unspecified purposes.

Absent some basic factual allegations about what this supposed federal subsidy is, when it was received, whether it is still being received, and what it was received for, Plaintiffs have not pleaded facts sufficient to plausibly infer that the Volunteer Defendants receive federal financial assistance and thereby agreed to be subject to Section 504. Without that, the Volunteer Defendants cannot figure out what funds they are accused of receiving, let alone whether those funds are federal subsidies subject to Section 504.

In any event, if Plaintiffs are attempting to sue the Volunteer Defendants in their individual capacities under Section 504, no such claim exists. "[N]either Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits[.]" *Garcia v. SUNY Health Sciences Center*, 280 F. 3d 98, 107 (2d Cir. 2001).

## IV. Plaintiffs Cannot Use Section 1983 to Salvage Defective ADA Title II and Rehabilitation Act Claims.

Plaintiffs also bring a claim under 42 U.S.C. § 1983 against the Volunteer Defendants premised on "the ADA and the Rehabilitation Act." Am. Compl. ¶ 155.[3] Even assuming that volunteers moving street furniture is sufficient to allege that they were acting under color of law, the Second Circuit has confirmed that Section 1983 cannot be used to circumvent the limits on relief in "the Rehabilitation Act or the ADA." *Costabile v. New York City Health & Hosps. Corp.*, 951 F.3d 77, 83 (2d Cir. 2020) ("[T]he rights established in the Rehabilitation Act may not be enforced through § 1983."); *id.* at 83 n.28 (collecting cases finding that ADA and Rehabilitation Act claims could not be repackaged under Section 1983). The Section 1983 claim is thus entirely devoid of merit, and Plaintiffs' failure to disclose controlling precedent rejecting precisely the theory they allege is concerning, to say the least.

## V. The Court Should Decline to Assert Supplemental Jurisdiction Over Plaintiffs' State Law Claims, But, In Any Event, They Fail.

Without a federal question, the "strong preference" in this Circuit is "to decline to exercise supplemental jurisdiction under § 1367(c)(3)." *Schiffman v. Epstein*, 04-CV-2661, 2009 WL 1787760, at *7 (S.D.N.Y. June 23, 2009). Dismissal is therefore appropriate for that reason alone.

---

[3]     Plaintiffs' attempt to rely on other, unspecified statutes is plainly inadequate to state a claim insofar as the Volunteer Defendant are given no notice of what statutes pursuant which they are being sued.

Apart from the Court's lack of supplemental jurisdiction over the State and City HRL Claims, Plaintiffs have failed in any event to plead that the Volunteer Defendants had the requisite authority to grant the accommodation sought. What is required is that Plaintiff allege that the Volunteer Defendants "***actually had the power*** to grant the reasonable accommodation." *Abadi v. NYU Langone Health Sys.*, No. 21 Civ. 11073, 2023 WL 8461654, at *8 (S.D.N.Y. Dec. 7, 2023) (emphasis added). They have not, and so the State and City HRL claims fail.

### A.    If It Dismisses the ADA, Rehabilitation Act, And Section 1983 Claims, This Court Should Decline to Exercise Supplemental Jurisdiction Over Plaintiffs' State and City HRL Claims

The sole alleged basis for this Court's jurisdiction over the HRL claims is 28 U.S.C. § 1367(a). As set forth below, should this Court dismiss the federal claims, dismissal of the state-law claims must follow.

28 U.S.C. § 1367 provides that this Court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367. As the Second Circuit "has held, as a general proposition, that if all federal claims are dismissed before trial . . . the state claims should be dismissed as well." *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir. 2004). Indeed, the "strong preference" in this Circuit is "to decline to exercise supplemental jurisdiction under § 1367(c)(3) when all of the federal claims are dismissed from the suit prior to trial." *Schiffman*, 2009 WL 1787760, at *7. Relying upon the "strong preference" announced by the Second Circuit, this Court declined to exercise supplemental jurisdiction over New York State and City Human Rights Law claims where it had dismissed the ADA claims on which its jurisdiction relied. *Butler v. St. Stanislaus Kostka Cath. Acad.*, 609 F. Supp. 3d 184, 204 (E.D.N.Y. 2022) (Komitee, J.). It should similarly do so here.

### B. Plaintiffs' Claims Under the New York State and New York City Human Rights Laws Fail for the Same Reasons as Their ADA Claim

Plaintiffs bring two non-federal claims in their Amended Complaint: Alleged violations of the New York State Human Rights Law ("State HRL") and the New York City Human Rights Law ("City HRL"). As set forth below, Plaintiffs' State HRL claim fails the for same reasons their ADA claim fails.

### 1. Plaintiff's State HRL Claims Rise and Fall with Their ADA Claim

As the Second Circuit has held, "to the extent that [a plaintiff] brings a state-law disability-discrimination claim, it survives or fails on the same basis as [plaintiff's] ADA claim." *Graves v. Finch Pruyn & Co.,* 457 F.3d 181, 184 n. 3 (2d Cir. 2006); *see also Morse v. JetBlue Airways Corp.*, 941 F. Supp. 2d 274, 292 (E.D.N.Y. 2013) ("A claim of disability discrimination under the NYSHRL is governed by the same legal standards as govern federal ADA claims."); *Romano v. SLS Residential Inc.*, 246 F.R.D. 432, 440–41 (S.D.N.Y. 2007) ("Plaintiffs' New York Executive Law § 296 claims are governed by the same legal standard as the ADA")*; Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 117 n. 1 (2d Cir.2004). "[T]he only major difference in the analysis of disability discrimination claims under NYHRL and the ADA is that the definition of disability under the New York State Executive Law is broader than the ADA definition." *DeNardi v. DRA Imaging, P.C.*, 605 F. Supp. 2d 550, 557 (S.D.N.Y. 2009). As the Volunteer Defendants do not move on that basis, this "only major difference" between the State HRL and the ADA is not pertinent to this dispute.

### 2. Plaintiffs' City HRL Claims Also Fail

The result for Plaintiffs' City HRL claim is the same: "While the NYCHRL 'provides somewhat broader rights' than the ADA and requires 'independent liberal construction,' ***claims for disability discrimination arising under the NYCHRL are governed by the same legal***

*standards as federal ADA claims*." *Roberman v. Alamo Drafthouse Cinemas Holdings, LLC*, 67 Misc. 3d 182, 184-85 (N.Y. Sup. Ct. 2020) (emphasis added); *Sullivan v. Study.com LLC*, 18-CV-1939 (JPO), 2019 WL 1299966, at *6 (S.D.N.Y. Mar. 21, 2019); *see also DaPonte v. Manfredi Motors, Inc.*, 335 F. Supp. 2d 352, 357 (E.D.N.Y. 2004), *aff'd,* 157 F. App'x 328 (2d Cir. 2005) (recognizing that "this Court's discussion of Plaintiffs' ADA claims also applies to their state and city [HRL] claims" and dismissing such claims on that basis).

### C. The Volunteer Defendants Lacked the Authority to Grant the Requested Accommodation and Thus Cannot be Held Liable.

Additionally, Plaintiffs have not met their burden to plausibly allege that the Volunteer Defendants engaged in unlawful conduct under the State or City HRL. Absent any plausible and cognizable allegations that the Volunteer Defendants "personally engaged" in unlawful acts, the State and City HRL claims against them should be dismissed. *Abadi*, 2023 WL 8461654, at *7.

In order to hold an individual liable under the State or City HRL, Plaintiffs "must show that the individual was *personally involved* in engaging in discriminatory acts." *Abadi,* 2023 WL 8461654, at *7 (S.D.N.Y. Dec. 7, 2023); *see also Plasencia v. City of New York Dept. of Educ.*, 2023 WL 6161928, at *3 (S.D.N.Y. Sept. 21, 2023) ("To make out a claim against an individual defendant under the [NY]SHRL . . . a plaintiff must . . . show direct, personal involvement in discriminatory conduct.") (internal quotation marks omitted); *Cardwell v. Davis Polk & Wardwell LLP*, 2021 WL 4434935, at *24 n.13 (S.D.N.Y. Sept. 23, 2021) ("[T]he NYSHRL, and the NYCHRL all require a plaintiff to allege that a defendant was personally involved in the discrimination."); *Kirkland-Hudson v. Mt. Vernon City Sch. Dist.*, 2023 WL 2691622, at *30 (S.D.N.Y. Mar. 29, 2023) ("Under the NYSHRL ..., individual liability ... requires personal involvement of a defendant.") (internal quotation marks omitted).

The Amended Complaint "lacks factual allegations showing that the Individual Defendants were personally involved in engaging in discriminatory conduct"—here, the alleged failure to provide a reasonable accommodation to the City's stated policies. *Abadi*, 2023 WL 8461654, at *8 (dismissing claims against individual defendants on that basis).

Plaintiffs' allegations demonstrate that the Volunteer Defendants lacked the authority to grant the "reasonable accommodation" sought by Plaintiffs. This alone merits dismissal of the State and City HRL Claims.

As alleged by Plaintiffs, each Volunteer Defendant submitted applications and signed management agreements that specify what Volunteer Defendants are permitted to do on an Open Street. Am. Compl. ¶ ¶ 142-3. These management agreements, which Volunteer Defendants agreed to, *id* at ¶ 143, provide strict limitations on how they may operate the Open Street. *See id.* at ¶ 139-40. They specify, among other things: "plan requirements for unobstructed 15 foot emergency lanes," "days and hours of operation including time needed for set up," "operation and breakdown, how barricades will be managed and monitored," "cleaning and trash disposal procedures," "the number of staff on site for the duration of the closure," and "how partners will ensure the site is clear and the roadway reopened at the end of each day." Am. Compl. ¶ 140. They further require prior written consent from the City to change the times of closures or select programming. *Id.* at ¶ 141.

Together, these limitations rendered the Volunteer Defendants unable to grant any reasonable accommodation in a public space over which they were provided a limited license to operate city-directed activities. These allegations fall short of what is needed: What is required is that Plaintiff alleged that "any of these defendants ***actually had the power*** to grant the reasonable accommodation." *Abadi*, 2023 WL 8461654, at *8 (emphasis added); *see also Erasmus v.*

*Deutsche Bank Am. Holding Corp.*, 2015 WL 7736554, at *8 (S.D.N.Y. Nov. 30. 2015) (no direct liability under the NYSHRL for individuals without an "ownership interest or any power to do more than carry out [] decisions made by others."). Plaintiffs have thus failed to allege a key element of their State and City HRL Claims.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Amended Complaint with prejudice.

Dated:     New York, New York     /s/ Joseph M. Sanderson
                 March 1, 2024          Joseph Sanderson

**STEPTOE LLP**

Joseph M. Sanderson
josanderson@steptoe.com
1114 Avenue of the Americas
New York, New York 10036-7703
Telephone: 212 506 3900
Facsimile: 212 506 3950

**VACCARO LAW**

Steve Vaccaro (steve@vaccaro-law.com)
Christopher B. Greene
(christopher@vaccaro-law.com)
150 Broadway, Suite 1212
New York, NY 10038

*Attorneys for Defendants North Brooklyn Parks Alliance, North Brooklyn Open Streets Community Coalition, North Brooklyn Mutual Aid, 34th Avenue Open Streets Coalition, Noel Hidalgo, Kevin Lacherra, Nuala O'Doherty-Naranjo, Jeffrey Hodsdon and Jim Burke*